# United States District Court
## Central District of California

| UNITED STATES OF AMERICA vs. | Docket No. | CR02-00220-(B)-SJO |
|---|---|---|

**Defendant**  SOLOVYEVA, Natalya

akas:  Natalia V. Adamova; Natalia Soloviova; Natalia Solovyeva; Natalja Solovyeva

Social Security No. 9  1  9  0

(Last 4 digits)

---

**JUDGMENT AND PROBATION/COMMITMENT ORDER**

---

In the presence of the attorney for the government, the defendant appeared in person on this date.

| MONTH | DAY | YEAR |
|---|---|---|
| Feb. | 20, | 2008 |

**COUNSEL**  [x] WITH COUNSEL   Michael M. Crain and Terry J. Amdur, appointed

(Name of Counsel)

**PLEA**  [x] GUILTY, and the court being satisfied that there is a factual basis for the plea.  [ ] NOLO CONTENDERE  [ ] NOT GUILTY

**FINDING**   There being a finding/verdict of [x] GUILTY, defendant has been convicted as charged of the offense(s) of:

**18 USC § 1203: Conspiracy to take hostages resulting in death as charged in count one of the second superseding indictment; 18 USC § 1203: Hostage-Taking resulting in death as charged in counts three and four of the second superseding indictment.**

**JUDGMENT AND PROB/ COMM ORDER**   The Court asked whether defendant had anything to say why judgment should not be pronounced.  Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of:

It is ordered that the defendant shall pay to the United States a special assessment of $300, which is due immediately.

It is ordered that the defendant shall pay restitution in the total amount of $725,245 pursuant to 18 U.S.C. § 3663A.

The amount of restitution ordered shall be paid as follows:

| Victim | Amount |
|---|---|
| George Safiev c/o Konstantinos Tezhik | $ 725,245 |

Restitution shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.  If any amount of the restitution remains unpaid after release from custody, nominal monthly payments of at least $50 shall be made during the period of supervised release.  These payments shall begin 30 days after the commencement of supervision. Nominal restitution payments are ordered as the court finds that the defendant's economic circumstances do not allow for either immediate or future payment of the amount ordered.

The defendant shall be held jointly and severally liable with co-participants Iouri Mikhel, Jurijus Kadamovas, Petro Krylov, Ainar Altmanis, and Aleksejus Markovskis  (Docket No. CR02-00220) for the amount of

USA vs.  **SOLOVYEVA, Natalya**                                    Docket No.:  **CR02-00220-(B)-SJO**

restitution ordered in this judgment.

Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the restitution ordered is waived because the defendant does not have the ability to pay interest.  Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

The defendant shall comply with General Order No. 01-05.

All fines are waived as it is found that the defendant does not have the ability to pay.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Natalya Solovyeva, is hereby committed on counts one, three, and four of the second superseding indictment to the custody of the Bureau of Prisons to be imprisoned for a term of 180 months.  This term consists of 180 months imprisonment on each of counts one, three and four of the second superseding indictment, to be served concurrently.

If released from imprisonment, the defendant shall be placed on supervised release for a term of five years. This terms consists of five year on each of counts one, three and four of the second superseding indictment, to be served concurrently under the following terms and conditions:

1. The defendant shall not commit any violation of local, state or federal law or ordinance.

2. The defendant shall comply with the rules and regulations of the U. S. Probation Office and General Order 318;

3. During the period of community supervision the defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment;

4. The defendant shall comply with the immigration rules and regulations of the United States, and if deported from this country, either voluntarily or involuntarily, not reenter the United States illegally. The defendant is not required to report to the Probation Office while residing outside of the United States; however, within 72 hours of release from any custody or any reentry to the United States during the period of Court-ordered supervision, the defendant shall report for instructions to the United States Probation Office, located at the United States Court House, 312 North Spring Street, Room 600, Los Angeles, California  90012;

5. The defendant shall not obtain or possess any driver's license, Social Security number, birth certificate, passport or any other form of identification in any name, other than the defendant's true legal name, without the prior written approval of the Probation Officer; nor shall the defendant use, for any purpose or in any manner, any name other than her true legal name;

6.     The defendant shall cooperate in the collection of a DNA sample from the defendant; and

7.     As directed by the Probation Officer, the defendant shall apply monies received from income tax refunds, lottery winnings, inheritance, judgements and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation.

The drug testing condition mandated by statute will be imposed because there is evidence in this case that the defendant supplied controlled substances.

The Court advises the defendant of his right to appeal.

The Court recommends that the defendant be incarcerated in Southern California.

In the interest of justice the Court dismisses any underlying indictment(s).

The Court orders that a copy of the transcript shall be attached to this judgment.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

February 20, 2008

Date

S. James Otero

U. S. District Judge/Magistrate Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Sherri R. Carter, Clerk

February 20, 2008

Filed Date

By     Victor Paul Cruz

Deputy Clerk

USA vs.   **SOLOVYEVA, Natalya**                    Docket No.:   **CR02-00220-(B)-SJO**

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

## STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant shall not commit another Federal, state or local crime;
2. the defendant shall not leave the judicial district without the written permission of the court or probation officer;
3. the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
4. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
5. the defendant shall support his or her dependents and meet other family responsibilities;
6. the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
7. the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
8. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
9. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;
10. the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12. the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
13. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
14. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
15. the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
16. and, for felony cases only: not possess a firearm, destructive device, or any other dangerous weapon.

[x]   The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below).

## STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1). Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g). Interest and penalties pertaining to restitution , however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office. 18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution-pursuant to 18 U.S.C. §3664(k). See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:

    1. Special assessments pursuant to 18 U.S.C. §3013;
    2. Restitution, in this sequence:
            Private victims (individual and corporate),
            Providers of compensation to private victims,
            The United States as victim;
    3. Fine;
    4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
    5. Other penalties and costs.

USA vs.   **SOLOVYEVA, Natalya**                      Docket No.:   **CR02-00220-(B)-SJO**

## SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

## RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

By _____

_____                   Deputy Marshal
Date

## CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

By _____

USA vs.  **SOLOVYEVA, Natalya**                                    Docket No.:  **CR02-00220-(B)-SJO**

_____                    _____

Filed Date                                               Deputy Clerk

### FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them.

(Signed) _____        _____
          Defendant                                        Date

          _____        _____
          U. S. Probation Officer/Designated Witness         Date

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: CR-02-220-(B)-SJO |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| NATALYA SOLOVYEVA, | ) | |
| | ) | Wednesday, February 20, 2008 |
| Defendant. | ) | (9:08 a.m. to 10:46 a.m.) |

SENTENCING RE GUILTY PLEA COUNTS ONE, THREE AND FOUR
OF THE SECOND SUPERSEDING INDICTMENT

BEFORE THE HONORABLE S. JAMES OTERO,
UNITED STATES DISTRICT JUDGE

Appearances:   (See next page)

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

**APPEARANCES FOR:**

The Government:   GEORGE S. CARDONA, ESQ.
          Acting United States Attorney
          THOMAS P. O'BRIEN, ESQ.
          Assistant United States Attorney
          Chief, Criminal Division
          SUSAN J. DEWITT, ESQ.
          ROBERT E. DUGDALE, ESQ.
          KIM MEYER, ESQ.
          Assistant United States Attorney
          312 North Spring Street
          Los Angeles, CA 90012

Also present:     Special Agent Louis Perez

The Defendant:    MICHAEL M. CRAIN, ESQ.
          Michael M. Crain Law Offices
          P.O. Box 3730
          Santa Monica, CA 90408

          TERRY J. AMDUR, ESQ.
          Terry J. Amdur Law Offices
          1939 Rose Villa Street
          Pasadena, CA 91107

Court Recorder:    Margarita Lopez

Deputy Clerk:     Victor P. Cruz

Interpreter:      Ludmilla Genn

Law Clerks:      Tony Lopez
          Andrew Gloger

Transcribed by:    Exceptional Reporting Services, Inc.
          14493 S. Padre Island Drive
          Suite A-400
          Corpus Christi, TX 78418-5940
          361 949-2988

1    Los Angeles, CA; Wednesday, February 20, 2008; 9:08 a.m.

2          (Interpreter utilized for translation)

3              (Call to Order)

4          THE CLERK:  All rise.

5          This is Item Number one, Case Number CR-02-00220(B)-

6    SJO; *United States of America versus Natalya Solovyeva.*

7          Counsel, would you please state your appearances?

8          MR. DUGDALE:  Good morning, your Honor; Robert

9    Dugdale, Susan DeWitt, and Kim Meyer on behalf of the United

10   States of America.  And we're joined at counsel table by

11   Special Agent Louis Perez of the FBI.

12         MR. CRAIN:  Good morning, your Honor; Michael M.

13   Crain and Terry Amdur for Ms. Solovyeva.

14         THE COURT:  Good morning.

15         Okay, the matter is here for the purposes of

16   sentencing.  Because of the nature of the matter, the Court

17   will conduct sentencing with the defendant seated at counsel

18   table, and counsel can remain at counsel table also.

19         THE INTERPRETER:  Excuse me, your Honor.  Interpreter

20   cannot hear at microphone.

21         THE COURT:  Your microphone is on.  Are you able to

22   hear now?

23         THE INTERPRETER:  No.

24         THE COURT:  No?

25     (The Court confers with the Clerk)

EXCEPTIONAL REPORTING SERVICES, INC

4

1       THE COURT:   The equipment should be tested before the

2  Court takes the bench.

3       THE INTERPRETER:   Excuse me?

4       THE COURT:   The equipment should be tested before the

5  Court takes the bench.

6  **(Pause - Equipment is tested)**

7       THE COURT:   Victor, can you assist, please?

8       THE CLERK:   Sir?

9       THE COURT:   Can you assist?

10       THE CLERK:   Yeah, I'm going to --

11       THE COURT:   Because Mr. Umansky is there, and he

12  shouldn't be doing this.

13       THE INTERPRETER:   Will you try again, please?

14       THE COURT:   Yes.   Is it working?

15  **(No audible response)**

16       THE COURT:   Okay.

17       THE INTERPRETER:   Sorry.

18       THE COURT:   And we thank you, Mr. Umansky, for

19  assisting in the operation of the equipment.

20       MS. DEWITT:   Multi-talented man.

21       THE COURT:   Again, the matter is here for purposes of

22  sentencing.   The Court will conduct sentencing with the

23  defendant seated at counsel table along with her attorneys.

24       In preparation for today's sentencing proceeding, the

25  Court has reviewed various documents and pleadings.   I want to

1  make sure that I have covered everything.

2       The Court has again reviewed the Plea Agreement; in

3  particular the factual basis, which is Exhibit A attached to

4  the Plea Agreement; the stipulated factual basis.

5       The Court has read and considered the Presentence

6  Investigation Report with a notification date of September 10th

7  of 2007.

8       In the PSR, there were certain letters submitted on

9  behalf of the defendant.  The Court has reviewed each of those

10  letters.  The letters can be summarized as follows.  The

11  defendant submitted a letter on her own behalf.  There are also

12  letters from the Russian Government.  The Russian Foreign

13  Minister sent a letter to the Attorney General asking that the

14  United States not seek the death penalty.

15       The Court has reviewed that letter; it's not relevant

16  really to the proceedings today.

17       The second letter was from the Russian Consulate

18  requesting that the defendant not be given a life sentence;

19  again, not particularly relevant because the defendant will not

20  be sentenced to life.

21       The remaining letters attached to the PSR include

22  letters from spiritual advisors and instructors attesting to

23  the defendant's work, cooperation, and involvement in custody.

24       The Court has also read and considered the

25  confidential letter recommendation from the Probation Officer

1  to the Court dated 10/09/2007.  The recommendation is without

2  the benefit of the Government's 5(k) motion, and the

3  recommendation is life without the possibility of release.

4       The Court has read and considered the defendant's

5  pleading, sentencing pleading, filed and dated 11/10/2007 and

6  objections to the Presentence Investigation Report.

7       The Court has read the Government's position pleading

8  dated January 10th, 2008.

9       The Government concurs with the findings and

10 conclusions in the PSR, and pursuant to a motion that the

11 Government has filed, 5(k)1.1, because of the defendant's

12 substantial cooperation and assistance, the Government requests

13 that the Court depart from a level 43 ten levels, to a level

14 32, and sentence the defendant to a term of 132 months, five

15 years supervised release, and then restitution as mandated by

16 statute.

17      The Court has reviewed the addendum to the

18 Presentence Report and the revision to the Presentence Report

19 which was disclosed January 14th, 2008.  The addendum in

20 particular addresses each of the objections raised by counsel

21 for the defendant.

22      The Court has also received and read and considered

23 the Government's supplemental submission regarding sentencing

24 of the defendant.  And attached to that Governmental submission

25 which was filed February 12th, the Government has offered a

1   letter as Exhibit A, which is a letter from supervising Special

2   Agent Perez, who's here in the courtroom.  And the Court has

3   carefully considered all of the matters and issues addressed in

4   that letter in the Government's supplemental pleading.

5           We start with the Presentence Investigation Report.

6   I want to make sure that the defendant has an opportunity to

7   review it.

8           Ms. Solovyeva, did you have an opportunity to have

9   that report translated for you from English into Russian?

10          **THE DEFENDANT:**  I have read it and understood it.

11          **THE COURT:**  Would you speak into the microphone,

12  please, as opposed to turning around and speaking to the

13  interpreter?

14      **(Ms. Solovyeva complies)**

15          **THE COURT:**  And did you also receive the addendum to

16  the report and the revision dated January 14th, 2008?

17          **THE DEFENDANT:**  Yes.

18          **THE COURT:**  And was that document also translated for

19  you from Russian into English (sic)?

20          **THE DEFENDANT:**  Yes.

21          **THE COURT:**  And did you have the opportunity to

22  discuss the contents of that document with your counsel?

23          **THE DEFENDANT:**  Yes.

24          **THE COURT:**  And do you feel that you've had enough

25  time to discuss the addendum, the revised PSR, and the initial

1   PSR with your attorney?

2            THE DEFENDANT:  Yes.

3            THE COURT:  And does counsel believe that you've had

4   enough time to consider the PSR and discuss it with your

5   client?

6            MR. AMDUR:  Yes, your Honor.

7            MR. CRAIN:  Yes.

8            THE COURT:  Okay.  We'll start with the Presentence

9   Investigation Report.  The record should reflect that the

10  defendant, Ms. Solovyeva, entered a plea of guilty to Counts

11  One, Three, and Four of the Superseding Indictment.

12           Count One charged the following:

13           Beginning on a date unknown and continuing until on

14  or about February 19th, 2002, the defendant, along with the

15  other named co-conspirators, conspired to seize and detain

16  other persons, including Mr. Muscatel, Ms. Rita Pekler,

17  Alexander Umansky, Mr. Kharabadze, and Mr. Safiev and

18  threatened to kill, injure and continue to detain the victims

19  to compel third persons to pay money as a condition for the

20  release of the victims with the death of the victims resulting.

21           Count Three charged on or about January 20th, 2002,

22  the defendant, along with the other named defendants,

23  threatened to kill, injure and continue to detain and to compel

24  Mr. Safiev to meet Mr. Kharabadze at a particular location

25  where Mr. Safiev could be abducted so that Mr. Safiev's

1   business associate would be compelled to pay ransom money as a

2   condition for the release of Mr. Kharabadze.

3          The conspirators' act of seizing and detaining Mr.

4   Kharabadze resulted in his death.

5          Count Four charged that on or about January 20th,

6   2002, the defendant, along with the other named defendants,

7   threatened to kill, injure, and continue to detain him to

8   compel Mr. Safiev's business associate to pay ransom money as a

9   condition for the release of Mr. Safiev.

10          Again, the conspirators' act of seizing and detaining

11   Mr. Safiev resulted in Mr. Safiev's death.

12          The Court has considered the offense conduct detailed

13   in the Presentence Investigation Report.  The defendant,

14   through counsel, has objected to various portions of the PSR

15   which have been addressed in the addendum.  On page six of the

16   PSR, the defendant has objected to paragraphs nine, ten, 11,

17   and 12.

18          In reference to paragraph nine, the defendant

19   objected to the extent it suggested that the defendant

20   participated in the abduction of Ms. Pekler, and that has been

21   corrected in the revised PSR.

22          I would point out that in the stipulated factual

23   basis attached to the Plea Agreement, the defendant admitted

24   that she was aware of the abduction of Ms. Pekler; that she

25   assisted in the detention of Ms. Pekler by dropping off the

1  Nissan Quest to the location where Ms. Pekler was being held.

2  And also, she participated in that by washing the jeans of Mr.

3  Krylov.

4         Those jeans, according to the admissions in the Plea

5  Agreement and the evidence elicited at trial, Mr. Krylov had

6  blood on his jeans and she helped him remove that blood.  And

7  she also participated in that detention and abduction by

8  locating Ms. Pekler's passport.  So, I think that probably

9  better reflects her involvement in reference to Ms. Pekler.

10        The defendant also objected to paragraph ten to the

11  extent it suggests that the defendant had a role in the

12  abduction of Mr. Umansky and also Ms. Pekler.

13        And then she objected to paragraph 11 because

14  paragraph 11 failed to specify which defendants were

15  responsible for the acts enumerated in that paragraph.

16        And then finally, she objected to paragraph 12.  In

17  particular, paragraph 12 references that she was enamored with

18  Mr. Safiev's home, and she claims that she was not so enamored.

19        I believe, and counsel could address this later, I

20  believe the revised PSR has corrected the concerns regarding

21  the characterization of facts or alleged facts stated in the

22  PSR.

23        In reference to all of the other objections, the

24  Court will make it clear that the facts that the Court relied

25  on in determining the appropriate sentence for the defendant

1  are the facts stipulated to in the Plea Agreement and also the

2  evidence elicited at trial, and so the Court would, for

3  purposes of the record, decline to rule on any remaining

4  objections that would remain after the revised PSR pursuant to

5  32(i)(3)(B) of the Federal Rules of Criminal Procedure.

6       The Court has continued with its review of the

7  alleged facts in the PSR.  Paragraph 19 the defendant objected

8  to because portions of paragraph 19 describe her providing

9  food.  She denies delivering food or anything else to the

10 Weslin house involving Mr. Kharabadze.

11      I would point out I think that's probably a fair

12 concern on the part of the defendant, brought to the attention

13 of the Court through counsel.  I would, however, place on the

14 record that on page 21 of the stipulated facts she admits that

15 she actually delivered food to that location, the Weslin house

16 location, in reference to Mr. Muscatel, who was also -- Well --

17      MS. DEWITT:  I think, your Honor --

18      THE COURT:  It was the other location.

19      MS. DEWITT:  It's the other location, yes, your

20 Honor.

21      THE COURT:  She admitted that she delivered food and

22 Demerol, which was a drug used to sedate certain of the

23 victims, to -- not to the Weslin house location but to Mr.

24 Mikhel's home.  And then she admitted also on page 22 that she

25 delivered food in reference to the person who was described as

1    the Armenian who was kept at the location also.  So she did

2    participate at times in reference to delivery of food and drugs

3    and vehicles.

4          The Court has reviewed all of the remaining

5    paragraphs.

6          In reference to paragraph 25, the defendant has

7    objected to paragraph 25.  Twenty-five reads:

8          Solovyeva was involved in the murders of at least two

9    individuals.  The relatives of these individuals are also

10    victims.  The defendant claims that she was only involved in

11    the plan to abduct, not in physically killing or murdering Mr.

12    Safiev or Mr. Kharabadze.  And I think that's probably a fair

13    statement.  She did not pull the trigger, metaphorically

14    speaking, but she was an important -- she played an important

15    role in their abductions.

16          And the Court has reviewed the paragraphs on page

17    nine regarding acceptance of responsibility.  The defendant has

18    accepted responsibility, clearly.

19          We start with the sentencing process by the Court

20    first considering the sentencing guidelines so the calculation

21    should be done, especially in this proceeding.

22          The Court would adopt the finding and conclusion in

23    paragraph 21 that the November 1st, 2006, guideline manual is

24    the guideline manual that is to be used.

25          The Court has reviewed the offense level calculations

13

1   offered by the Probation Officer.  The Probation Officer has

2   determined that the combined adjusted offense level is 45.  The

3   defendant has accepted responsibility, so the total offense

4   level would become 42.

5          As to Counts One, Three, and Four, the defendant has

6   objected to the calculation in paragraph 39.  The defendant

7   believes, or counsel for the defendant believes, that she

8   qualifies for a minor role adjustment because she did not

9   physically restrain, kill, or dispose of any of the bodies, and

10  she did not participate -- she claims that she did not

11  participate; they would have been abducted in any event; the

12  reference to Mr. Kharabadze and Mr. Safiev, I believe.

13         So again, metaphorically speaking, she did not pull

14  the trigger in reference to any of the victims, but she did

15  play a significant role in the abductions of Mr. Kharabadze and

16  Mr. Safiev.

17         She helped plan the kidnapping of Mr. Safiev as early

18  as July, 2002.  When she participated in the planning of the

19  kidnapping of Mr. Safiev, she knew, in the Court's view, that

20  they would be killed because of all of the other information

21  she had regarding prior murders, including statements made by

22  her husband regarding murders that had taken place in other

23  parts of the world, and then the clear evidence she saw in

24  reference to the murder of Ms. Pekler.

25         Mr. Umansky, her knowledge of the abduction of the

1  person that has been described by the Government as being their

2  minion.

3         And if we look also, in terms of her role in the

4  abduction and planning of the murders of Mr. Safiev and Mr.

5  Kharabadze, if we look at the Government's pleading in

6  reference to Mr. Markovskis, and I'm referring to the

7  Government's pleading of January 10th, 2008, entitled

8  'Government's Amended Position Regarding the Sentencing of

9  Defendant Markovskis'.

10        On page 15 of that pleading, in reference to the

11  conversation that Mr. Markovskis had with Mr. Kadamovas when

12  they were at the Weslin house location where Mr. Safiev and Mr.

13  Kharabadze were being held, Mr. Kadamovas told Mr. Markovskis

14  that Ms. Solovyeva had found George Safiev.  In other words,

15  the plan to abduct Mr. Safiev apparently was -- that issue was

16  raised by her.  And Mr. Kadamovas tells Mr. Markovskis that she

17  set the whole thing up, referencing his wife, and in return she

18  was going to get a new car.

19        So, I think it's pretty clear from all of the

20  testimony, including the admissions in the Plea Agreement and

21  the Government's position regarding Mr. Markovskis, but for her

22  involvement, Mr. Safiev and Mr. Kharabadze would probably be

23  alive today.

24        So, in reference to paragraph 39, the defendant

25  claims that she is entitled to a minor role adjustment because

1   she did not physically kill and the persons would have been

2   killed in any event.  And the Court disagrees.  It's clear that

3   she helped plan the kidnapping of Mr. Safiev as already

4   mentioned.  She was the lure who brought in Mr. Kharabadze.

5   And when she lured in Mr. Kharabadze in order to secure Mr.

6   Safiev, she knew both of them would be killed because of the

7   prior history here.

8            So, the Court would just conclude that she is not a

9   minor participant at all.  She's at least an average

10  participant and certainly not an organizer or leader, and

11  therefore there would be no level increase for that role.  But

12  certainly she is not entitled to mitigating role adjustment.

13           So, the Court would conclude that the calculations in

14  the PSR of 42, with the acceptance of responsibility, is the

15  correct calculation.

16           The Court has also considered all of the other

17  relevant conduct, offense behavior not part of the relevant

18  conduct, I'm sorry, that's referenced in the PSR.

19           And the Court has considered the defendant's criminal

20  history.  She has no criminal history other than the conviction

21  in state court for the murders involved here, and those are not

22  counted in her criminal history.

23           The Court has reviewed the defendant's personal data.

24  She was born October 7th, 1975, in Russia.  She came to the

25  United States in 1998 on a six-month tourist visa and

16

1   overstayed her tourist stay and remained in the country

2   illegally.

3          The Court has reviewed her financial -- her alleged

4   financial dependence on her husband.  The Government has

5   claimed -- I believe the Government claimed, but certainly the

6   defendant claims, that she was financially dependent on her

7   husband, Mr. Kadamovas, and somewhat vulnerable and emotionally

8   dependent on him also.

9          I think there's probably some truth to that claim,

10  but at the same time, I think it's clear from the evidence that

11  the Court has that Ms. Solovyeva was motivated also by greed.

12  She benefitted by the Weslin home that Mr. Kadamovas had

13  purchased.  She saw herself moving up in the world.  According

14  to the statement provided by Mr. Kadamovas to Mr. Markovskis,

15  she was going to get a vehicle for the abduction of Mr. Safiev.

16         She helped assist in that abduction, beginning in

17  July of 2001.  I believe he was actually abducted in January of

18  2002, so there was a planning process that was involved there.

19         The evidence reflects that she benefitted also

20  because there were certain monies that were transferred into

21  joint accounts.  In the trip that Mr. Kadamovas took with Mr.

22  Mikhel I believe to Aspen, Colorado, he returned with a fur

23  coat or a mink stole of some sort that she gladly took.

24         So, it's not simply that she's vulnerable

25  financially; she was also enamored with the lifestyle that they

EXCEPTIONAL REPORTING SERVICES, INC

1    were living.  I think that's a fair conclusion.

2          The Court has reviewed the mental and emotional

3    health of the defendant referenced here.  No obvious signs of

4    physical dysfunction, which could be a mitigating circumstance,

5    but nothing there.

6          In reference to substance abuse, she claims that she

7    drank infrequently.

8          In reference to the supervised release, the Court is

9    going to impose drug conditions because the evidence that was

10   elicited at trial, and more importantly in the admissions in

11   the Plea Agreement, is that she supplied Demerol, which is a

12   controlled substance, to sedate the victim.

13         The Court has reviewed the employment history.  The

14   defendant would not have the ability to pay any fines.

15         The Court has reviewed the sentencing options.

16   Probation is not in order; it's precluded.  It wouldn't be in

17   order in any event.

18         Restitution is mandated even though the plaintiff

19   (sic) will not have the ability to pay the restitution that's

20   mandated by law.  Paragraph 121 references that the amount of

21   restitution is $969,000.  Because of the monies that have been

22   recouped by the Government, that has to be reduced to $710,245;

23   as was done with Mr. Markovskis.

24         Paragraph 122; the defendant has objected to

25   paragraph 122.  The defendant objects claiming that the offense

1  of conviction, which is Title 18, U.S. Code 1203, contemplates

2  that death may result of the hostage and therefore a departure

3  is not in order.  That, the Court is going to decline to

4  address that.  It's just not important to the sentence today,

5  and the Court would decline to rule on that pursuant to

6  32(i)(3)(B).

7       I think that covers in detail the Presentence

8  Investigation Report.  As referenced, the defendant has

9  objected in the January 16th, 2008, filing.

10      I believe I've covered all the objections.

11      In the defendant's position pleading, the defendant

12  agrees with the ten-level departure pursuant to 5(k) urged by

13  the Government.  The defendant requests, however, that there

14  should be an additional two-level reduction for minor role.

15  And, assuming that the Court granted the ten-level reduction,

16  with the additional two-level, that would place the defendant

17  in a sentencing guideline range of 97 months to 120, and the

18  defendant urges the Court to impose a 97-month sentence.

19      I think the important issue that we need to address

20  is the Government's supplemental pleading.  In its supplemental

21  pleading, the Government has again requested that the Court

22  depart pursuant to 5(k) and urges the Court to depart ten

23  levels from a level of 42.  That would place her into a level

24  32 with a criminal history category of one.  The guideline

25  range would be 121 to 151 months, and the Government has

1   requested 132 months.  And the Special Agent has attached a

2   letter in support of the Government's request.

3           And let me just make it clear that this Court has, in

4   reference to Mr. Markovskis, has placed great weight on the

5   fact of cooperation and great weight in terms of encouraging

6   that behavior in the future.  At the same time, the Court is

7   compelled to factor in other considerations in the sentencing

8   process, including all of the factors enumerated in Title 18,

9   3235.

10          The Court has the role of making sure that not only

11  is the integrity of the 5(k) process maintained and the ability

12  of the Government to pursue these types of matters facilitated,

13  but the Court has the duty to make sure that justice is

14  accomplished; that the public sees or views the judicial system

15  as one that will impose a just sentence, considering all the

16  circumstances.

17          The Court has the duty to make sure that the victims,

18  the persons who are not here today because of the conduct of

19  the defendants, have their say through the Court.  And, as

20  referenced by counsel for the Government, these considerations

21  are sometimes conflicting.

22          And I understand the Government's position placing

23  great weight on matters that will make prosecutions in the

24  future easier for them, but at the same time, there are other

25  considerations that the Court has to address.

20

1      Now, that being said, I will hear further from

2  counsel for the Government regarding this issue.

3      I also want to stress, the Court has spent a lot of

4  time considering the appropriate sentence in light of the

5  Government's position pleading here, and I place great weight

6  on the opinion of counsel for the Government.  They represented

7  the Government extremely well during the course of the trial;

8  and also great weight in the position of the FBI in terms of

9  facilitating their work in the future; and in reference not

10  only to the future but this case also.

11      So, I'll hear from counsel for the Government if

12  that's not objected to by counsel for the defendant.

13      I also want to say a couple -- make a couple other

14  points here.  I've discussed -- I've counseled with other

15  Judges in this case, some very, very experienced Judges -- one

16  colleague just down the hall -- and the opinions range, but

17  nothing close to what is recommended by the Government.

18      And so we start.  But, the question I have is this:

19  The Court has already sentenced Mr. Markovskis, and the

20  sentence that the Court imposed was 180 months.  And I started

21  that process by intending to -- early on intending to impose a

22  sentence more severe than 180 months.

23      And in reference to the brief filed by the Government

24  regarding Mr. Markovskis and the brief filed by the Government

25  involving this defendant, I think it is clear that Mr.

1  Markovskis is less culpable than Ms. Solovyeva.

2       Is the Government -- Let me just find out what the

3  Government's position is.  Is the Government requesting that

4  this defendant be sentenced to a period of time less than the

5  time imposed involving Mr. Markovskis?

6       **MS. DEWITT:**  Your Honor, we stand by the

7  recommendations that we made with respect to both of the

8  defendants.  With all due respect to the Court, we don't agree

9  with the sentence that was imposed for Mr. Markovskis.  And I'm

10 placed in the awkward position to say something different here

11 because I don't believe that that sentence was appropriate,

12 with all due respect to the Court, and I stand by the

13 recommendation that we've made here with respect to Ms.

14 Solovyeva.

15      I think that Mr. Markovskis and Ms. Solovyeva are, of

16 all the participants that have been charged and convicted in

17 this case, clearly the least culpable people involved.  They

18 had different involvement --

19      **THE COURT:**  Well, let me --

20      **MS. DEWITT:**  -- that can be measured in different

21 ways and different mitigating factors.

22      **THE COURT:**  I'm sorry.  Let me just ask you this: Are

23 you asking the Court to, through a procedure that may be

24 utilized in the Federal Rules of Criminal Procedure, to correct

25 the sentence or to modify the sentence of Mr. Markovskis?

22

1     **MS. DEWITT:**  I believe that the recommendation that

2  we made was -- I stand by the recommendation, and yes, I would

3  encourage the Court to reconsider the sentence imposed for Mr.

4  Markovskis.  If it's the Court's position that he should be

5  sentenced to something less than Ms. Solovyeva, yes, I would

6  request it.

7     **THE COURT:**  Well, one of the factors under 3553 is

8  disparity in sentencing.  And I think that you recognize and I

9  recognize and probably everyone recognizes that Mr. Markovskis

10  is less culpable.  So, just in terms of disparity in

11  sentencing, I don't think we should have a situation where Mr.

12  Markovskis is sentenced to a term higher than Ms. Solovyeva.

13     **MS. DEWITT:**  I very much appreciate that, your Honor,

14  and I can't disagree with that, but I do also think that there

15  are some different mitigating factors that might factor into

16  that as well that relate to Ms. Solovyeva that may or may not

17  relate to Mr. Markovskis.

18     Let me just say, your Honor, six years ago yesterday

19  Mr. Mikhel and Mr. Kadamovas were arrested.  It's taken us six

20  years to get to this date, and, as the Court is well aware, we

21  were successful not only in prosecuting those two very ruthless

22  and cruel people, but in ultimately getting the death penalty

23  against them, which is, frankly and unfortunately, very

24  difficult to do in this jurisdiction.

25     One of the reasons that we were able to do that is

23

1   because of the cooperation not only of Ms. Solovyeva but of Mr.

2   Markovskis, of Mr. Altmanis.   The cooperation in this case is

3   extraordinary by any measure, and the results were

4   extraordinary, as is shown just historically by what has

5   happened in this District.

6           I recognize, we recognize, the Government recognizes,

7   the FBI recognizes that setting a sentence for these

8   cooperators is extremely, extremely difficult.   It's extremely

9   difficult for us to do.   It's not easy for us to get up here

10  and ask for leniency for someone who has helped to commit these

11  kinds of crimes.   It just isn't.   But we very, very carefully

12  factored in, frankly, a combination of over a hundred years of

13  experience on this case.

14          You know, each of us has spent more than five or six

15  years going through this evidence.   And it's not without

16  incredible soul searching and painstaking deliberation that we

17  came up with the recommendations.   And I'm not saying that we

18  know the exact number, because this is not an exact science.

19  It's a very difficult process.   But, those recommendations were

20  made through a painstaking process, and that's all we wanted to

21  bring to the Court's attention.   It's not to suggest that we

22  have any kind of greater ability to say the exact right number

23  that the Court should impose.

24          There are a couple of things also that the Court said

25  leading up to this that I just want to address very briefly,

1  because I think that they're not completely -- maybe not

2  completely accurate in the sense of the full picture of Ms.

3  Solovyeva.

4       One of the things is that in order to get the death

5  penalty against Mr. Kadamovas, one of the things that was

6  really important to be able to bring to the Jury's attention

7  was his full character, his full participation, his full

8  nature.  And one of the important people that could do that was

9  Ms. Solovyeva.

10      It would have been very easy for Mr. Kadamovas to

11 say, 'I was just following along with Mr. Mikhel.  I was just

12 following his lead.  He was this evil, horrible person, and I

13 was' -- And there was some evidence to suggest that might be

14 true.  We didn't believe it was true.  But it was through Ms.

15 Solovyeva's testimony about how he treated her and what kinds

16 of decision-making that he was involved in and what she was

17 able to observe.  And that, coupled frankly with what Mr.

18 Markovskis was able to bring to the table in terms of the

19 things that Mr. Kadamovas said, that we were able to paint for

20 the Jury a much more honest and full picture of Mr. Kadamovas'

21 role as being a co-equal participant with Mr. Mikhel.  And that

22 was an amazingly significant, I think, factor in getting the

23 ultimate sentence that we were able to get with respect to Mr.

24 Kadamovas.

25      With respect to Mr. Mikhel, you had to look at the

1    whole panoply from all of the testimony from all three of the

2    cooperators, and probably in his respect, much more significant

3    was Mr. Altmanis.

4           The second thing that the Court noted here that I

5    think is really not a fair characterization of Ms. Solovyeva,

6    and that is that she was motivated by greed.  There's no

7    argument that she benefitted in some way from each of these

8    crimes.  There's no question about that, and I don't think she

9    would deny that.  She did get gifts.  She did get a house.  She

10   did get, you know, those benefits.  But there is absolutely no

11   evidence that she had any control over any of those things.

12        THE COURT:  How about the statement I mentioned from

13   Mr. Kadamovas when he had the conversation at the Weslin house

14   talking to Mr. Markovskis, and he said that she had found Mr.

15   Safiev and helped set -- And this is your -- I'm just quoting

16   the Government --

17        MS. DEWITT:  Sure.

18        THE COURT:  -- helped set up the whole thing.  In

19   return, she was going to get a new car, and she knew that they

20   were going to be dead.

21        MS. DEWITT:  There are a couple of important, I

22   think, distinctions that need to be -- finer points that need

23   to be made about that statement.

24           First of all, there's no question that Ms. Solovyeva

25   is the person who brought Mr. Safiev to their attention.

1    There's no denying that, and I don't think she'll deny that.

2    The question is: When did she know that they were targeting

3    him?  And it's clear by all the evidence that we had that she

4    did not know that they were targeting him in July.

5            She did not --

6            THE COURT:  Her husband said she planned the whole

7    thing; set the whole thing up.

8            MS. DEWITT:  Her husband said that she was the one

9    that brought Mr. Safiev to their attention.  Don't deny it; I

10   don't think she'll deny it.  At some point, she began to gather

11   information for them.  Later on -- And she doesn't deny that

12   and we don't deny that.  And that information was important.

13   It's also clear that they got additional information from other

14   sources.

15           Now, his characterization of her involvement in this

16   is frankly ridiculous.  Yeah, she brought him to their

17   attention, but who planned this?  Mr. Kadamovas and Mr. Mikhel

18   planned this.  Who brought her into this?  Mr. Kadamovas and

19   Mr. Mikhel brought her into it.  Who brought Mr. Markovskis

20   into this?  Mr. Mikhel and Mr. Kadamovas did.

21           Yes, her role was important.  There's no question

22   about that, and I'm not suggesting otherwise.  But to suggest

23   that she somehow was the mastermind of it I think is unfair,

24   because I think the reality is she brought the name to their

25   attention and then they took it from there.

1    THE COURT:  Let's have an exchange, please.

2    She -- They targeted Mr. Safiev in July of 2001.  He

3 was actually abducted in January of 2002, is that correct?

4    MS. DEWITT:  That's right, but I don't believe that

5 there's evidence that they began targeting him at that point.

6 What we have is evidence that she actually went to the house

7 and took a videotape of his house.  There's no evidence that

8 Mr. Kadamovas even saw that.

9    THE COURT:  I'm sorry, she went to the house on seven

10 occasions, according to the pleadings.

11    MS. DEWITT:  Absolutely.  Don't deny that.

12    THE COURT:  She -- He wanted her to provide

13 information on Mr. Safiev.  She took a camera to that location.

14 At trial, she testified that she took the camera to simply film

15 her children.

16    MS. DEWITT:  That's all correct.

17    THE COURT:  I frankly found that difficult to accept

18 considering the sophistication of this group.  She was using

19 that camera, from the Court's point of view, to surveil the

20 location and provide further information to Mr. Kadamovas

21 regarding Mr. Safiev's home.  But apart from that, she was

22 going to get a BMW.

23    When she agreed to lure Mr. Kharabadze, she knew that

24 Mr. Muscatel had been murdered.  Her husband had told her that

25 he had committed a murder in Cyprus.  She knew Ms. Pekler had

1    been murdered.  She knew Mr. Umansky had been murdered.  She

2    knew this person was going to be killed.

3           MS. DEWITT:  And she admitted that, your Honor.  She

4    knew that -- not for certain -- but she admitted that she knew

5    that there was a very good chance that both of these

6    individuals were going to end up dead.  And I don't -- I'm not

7    standing here trying to excuse that behavior or to explain that

8    behavior, but I do think it's important to set it into context.

9           What we have here is a person -- And I respectfully

10   disagree that she knew when she went to film that house that

11   that's why.  But that's, you know, there's no evidence to

12   support that.  There is no testimony from Mr. Altmanis or Mr.

13   Markovskis that that was what they were planning on doing at

14   that date.

15          There's no question in my mind -- Well, I would like

16   to think that nobody would be stupid enough to film themselves

17   and their child in a place if they knew at the time that that's

18   the reason for it.

19          THE COURT:  Counsel --

20          MS. DEWITT:  She would have made sure she wasn't in

21   the film and that her kids weren't in the film.

22          THE COURT:  Counsel, Mr. --

23          MS. DEWITT:  But putting that aside --

24          THE COURT:  Counsel, look, Mr. Mikhel -- This was a

25   very sophisticated group, but they made some horrendous errors,

1   including Mr. Mikhel using the credit cards to go to the ATMs

2   and having his picture taken.  Not a very sophisticated thing

3   to do.  So, they planned well but they also made some

4   incredible mistakes is my point here.

5           MS. DEWITT:  No question.  That's how criminals get

6   caught.

7           THE COURT:  Including the filming.

8           MS. DEWITT:  And there's no question that the film

9   was a mistake.  But my only point is, your Honor, is I don't

10  believe that's why that film was taken at that time.

11          I don't deny that at some point Ms. Solovyeva

12  knowingly helped gather information that was an important part

13  of the later abduction and the resulting murders of Mr.

14  Kharabadze and Mr. Safiev.  On that point you and I are in

15  complete agreement.

16          The only issue that I take is that I think her

17  knowledge of what she thought was going on, what she suspected

18  was going on and whether she was intentionally helping, that

19  evolved over time, and it got to a point where it was

20  inexcusable.  But that's not where it started, and that's the

21  only point that I'm making.

22          And I'm not trying to excuse her behavior.  I'm just

23  trying to put it in context of the evolution that I think she

24  underwent.

25          THE COURT:  Okay.  Let me just see if I can

1   understand the Government's position here.  The Government --

2   And I respect the issue regarding substantial assistance and

3   need for it.  I'm one hundred percent in agreement.

4            The Government -- The defendant has pled to certain

5   Counts that require her to spend the rest of her life in prison

6   without the possibility of release.  She wasn't a volunteer in

7   terms of providing the information to the Government.  She made

8   a decision in her best interest.  She understood through

9   counsel that if she cooperated with the Government, there was a

10  substantial chance that she was going to be able to see the

11  light of day.  Without that cooperation, she was going to

12  remain in custody the rest of her life.

13           So this is not a person who says, 'You know, I need

14  to come forward.'  She did it in her own interest.

15           Now, the Government has recommended 132 months.  If I

16  do the math here, she serves 85 percent of her time.  She will,

17  assuming that she serves only 85 percent of her time, that

18  comes out to 112 months.  That means she does 9.3 years.  She

19  has already served six years in prison.  She gets out in

20  another three for being responsible for the murder of two

21  persons?  Explain that.

22           MS. DEWITT:  First of all, your Honor --

23           THE COURT:  How is that justified under the law?

24           MS. DEWITT:  Because of the substantial assistance

25  that she provided.

EXCEPTIONAL REPORTING SERVICES, INC

1          THE COURT:  And if she didn't provide that

2     assistance, she would be in there the rest of her life.

3          MS. DEWITT:  There's no question about that.

4          THE COURT:  Okay.

5          MS. DEWITT:  I can't argue with that.

6          THE COURT:  So that substantial assistance --

7          MS. DEWITT:  That's assuming that we would have been

8     able to convict her, first of all; assuming that we would have

9     been able to prove, which I think is in question, her

10    knowledge, because all the information that we have about her

11    knowledge and her state of mind came from her own statements,

12    your Honor.  And there's a certain level of inherent unfairness

13    to hold somebody accountable for something greater than what

14    you would have been able to prove had you just gone straight to

15    trial with them.

16          And I'm not saying that she shouldn't accept

17    responsibility for that, but she has.  But I think that the

18    Court should take that into consideration.

19          Anything we know about her state of mind, and most of

20    the things we know about what she suspected over time, is based

21    upon her own statements.  And if you penalize defendants who

22    come forward and cooperate by telling you stuff that you might

23    not have otherwise known, it creates a problem.

24          THE COURT:  Counsel, we're not here to penalize her.

25    I think we're on the same side there.  She is going to be

1  rewarded.  The question is: What reward does she receive?  You

2  want her to walk in three years for being responsible for the

3  murder of two individuals and --

4          MS. DEWITT:  I want her --

5          THE COURT:  -- assisting in the detention of the

6  rest.

7          MS. DEWITT:  Let me just say I think it's a little

8  unfair to talk about three years.  She was arrested in 2002.

9          THE COURT:  I understand.

10         MS. DEWITT:  So the fact that it took us six years to

11 get this case to this point should not be something that's held

12 against Ms. Solovyeva or Mr. Markovskis.

13         THE COURT:  Counsel, I'm not holding it against her.

14         You want a sentence of 9.3 years for the murder of

15 two people.

16         MS. DEWITT:  I want a sentence of 132 months, and I

17 want her, like any other defendant, to earn or not earn her

18 good time credits.  I don't calculate my sentence

19 recommendations based upon good time credits, but if that's the

20 way the Court sees it, then yes, that's what I'm recommending,

21 because I'm actually fairly optimistic that Ms. Solovyeva will

22 behave herself in custody and will continue to try to reform

23 herself, so she probably will get those credits.

24         THE COURT:  Okay.  Anything further?

25         MS. DEWITT:  I want to make one other point, your

1    Honor, and that is that -- Because I don't think that this is

2    something that was fully developed in the record of this Court

3    before you because Mr. Kadamovas was not a part of the trial

4    before you.  And that is I don't know that I captured this

5    adequately in my papers, so this is my fault.

6        It is an appreciation for just how incredibly cruel

7    and controlling Mr. Kadamovas was.  For example, we have a

8    wiretap conversation in which there are discussions between Ms.

9    Solovyeva and Ms. Karogodina talking about how Mr. Kadamovas at

10   a party had gotten drunk and basically threatened her and

11   almost broke her hand.  There's evidence like that.  And

12   there's other evidence to suggest how manipulative and how

13   controlling he is, and that's something that I think perhaps I

14   should have done a better job of explaining to the Court,

15   because that's not evidence that came in during our trial

16   because Mr. Kadamovas was not a part of that trial directly.

17       I think you have to take that relationship into

18   consideration as well.  Not an excuse, not a justification; but

19   just one of the additional factors in mitigation that doesn't

20   necessarily apply to the other cooperators in this case.

21       THE COURT:  Just a couple more comments.

22       Look, I understand that on the federal side, because

23   of the nature of the prosecutions, it's often very difficult to

24   secure a death verdict.  On the state side, it's not.  It

25   really comes down to the horror involved in the criminal acts.

1   And if you have horrific conduct, such as in this case, the

2   Jury most often, with the people who metaphorically pulled the

3   trigger, will return a verdict of death.  We have 600 on death

4   row in California.  It's done all the time.

5           MS. DEWITT:  I understand that, your Honor, and just

6   to --

7           THE COURT:  So, in reference to the two main

8   defendants here, those are clearly death penalty cases; clearly

9   death penalty cases.

10          MS. DEWITT:  And let me just emphasize, your Honor,

11  one last point.  I don't mean to interrupt you, but I

12  understand, and I don't mean any disrespect in taking the

13  position that we're taking here.  I understand this is a very,

14  very difficult decision for anybody to make as well as your

15  Honor, and we respect the decision that you're going to make.

16  I just want to make sure that you are fully apprised of the

17  facts to the best of my ability.

18          So, thank you, your Honor, for taking the time.

19          THE COURT:  I think you've done that to the best of

20  your ability.  Thanks.

21          May I hear from defense counsel?

22          MR. CRAIN:  Yes, your Honor.  Thank you.

23          Your Honor, I'm sure it's no surprise to the Court

24  that, except for the exact amount of time which we're asking

25  the Court to impose which has been set forth in Mr. Amdur's

EXCEPTIONAL REPORTING SERVICES, INC

1   pleadings, we're in complete agreement with the Government as

2   to their view of Ms. Solovyeva, her role in the case, and what

3   the fair and appropriate sentence should be.

4   　　　　　I'd like to say to the Court, we don't know each

5   other.  I've been in this business, your Honor, for 38 years,

6   both in the state and federal court.  I've tried death penalty

7   cases in both courts.  I've handled thousands and thousands of

8   defendants, and I think I have a pretty good handle on how to

9   size up a defendant.  And I've seen a lot of really bad people

10  who deserve very severe punishments, and I've seen others who

11  have found themselves in predicaments where, yes, they

12  committed an offense, they were involved in some sort of

13  criminal activity, but they are different than the other type

14  of defendant that I see.

15  　　　　　And this is not a case where anyone here is seeking

16  to offer legal excuses.  What we're talking about is

17  mitigation.  And I think as a member of the defense Bar since

18  1970, your Honor, that I'm sure the Court -- I'm not telling

19  the Court anything you don't know, but let me just say it

20  anyway.  The Government, in its determination that it needs

21  people to cooperate, that's also a factor that enters into the

22  decision-making process of any defense attorney, and it

23  certainly entered into our evaluation and recommendations and

24  advice to Ms. Solovyeva as to how we should deal with this

25  case.

1        This was a tryable case as to Ms. Solovyeva.   As Ms.

2   DeWitt has pointed out, Ms. Solovyeva, in her complete candor

3   with the Government and with the Jury, admitted to things that

4   she didn't have to, and without those admissions, the

5   Government's case, had it gone to trial, would have been in a

6   much different posture than if the evidence that was heard from

7   her lips on the witness stand and during the proffer sessions

8   had been available to be offered against her, which it was not.

9        But nonetheless, after great consideration about what

10   we should recommend to Ms. Solovyeva that she do, we reached a

11   decision.   And the Court can scoff at this; that it was in her

12   best interest and so forth.   Well, that's always the case, your

13   Honor.

14        In any case where a defendant elects to cooperate

15   with the Government, certainly there's going to be a

16   consideration of self-interest.   No cooperator does not think

17   of that.   It would be contrary to human nature to simply say

18   that all cooperators are simply doing it because they want to

19   receive a good citizenship award.

20        But, be that as it may, the defense Bar also, in

21   advising defendants whether or not to become a cooperator with

22   the Government, has to take into consideration what is going to

23   happen to that person.   And so all we can do is make a

24   decision, give them advice -- It's ultimately their decision,

25   not ours -- and to be truthful and to assure them that if you

37

1  cooperate and if you are truthful on the witness stand, you

2  will receive a fair and just sentence.

3      And although the two sides are somewhat apart on what

4  we think a fair and just sentence is, we're not that far apart.

5  And I think any sentence in excess of the Government's

6  recommendation, your Honor, with all respect to the Court,

7  based on Ms. Solovyeva, who she is as a person and what she

8  actually did in this case --

9      THE COURT:  She killed two people.

10     MR. CRAIN:  Well, she -- Your Honor, as the Court

11  pointed out repeatedly, and I was here for Mr. Markovskis's

12  sentencing.  And let me just say parenthetically, I think

13  people can differ about this.  I personally think that Mr.

14  Markovskis is more culpable than Ms. Solovyeva.

15     Ms. Solovyeva did not, nor did he, physically kill

16  anyone, but she did not engage in any physical conduct.  She

17  did not restrain people, as did Mr. Markovskis.  She did not

18  keep watch over them so they couldn't escape prior to being

19  transported to the lake.  She didn't do those kinds of things.

20     So, from a personal point of view, and from my

21  analysis of this case, and I've been on this case since 2002,

22  as has Mr. Amdur, we don't think that Mr. Markovskis is less

23  culpable, and we don't think that Mr. Markovskis -- that Ms.

24  Solovyeva should receive a greater sentence than Mr.

25  Markovskis.

1          And for what it's --

2          THE COURT:  That Ms. Solovyeva should not receive a

3  greater sentence than Mr. Markovskis?

4          MR. CRAIN:  She should receive a lesser sentence --

5          THE COURT:  Okay.

6          MR. CRAIN:  -- is what I mean to say.

7          THE COURT:  We just disagree.

8          MR. CRAIN:  Well, we do, and you're the Judge,

9  obviously, but I do want to tell the Court that.

10         And for what it's worth, the Court mentioned that

11 there is a parallel case that was settled with the District

12 Attorney's Office arising out of this, and the Court has stated

13 that the District Attorney agreed that both defendants, Mr.

14 Markovskis and Ms. Solovyeva, receive an eight-year sentence.

15 And it was evaluated by very experienced, high-level District

16 Attorneys, and I know the Court has a great deal of state court

17 experience.  So, that's how others have seen the case.

18         But whatever Mr. Markovskis' position may be, I'd

19 like to say one thing, because his name also came up in the

20 context of purported conversations between Mr. Kadamovas and

21 Mr. Markovskis.

22         And I completely disagree with any credence being

23 given to any statement that Mr. Kadamovas purportedly made.  I

24 mean, Mr. Kadamovas is not only everything that Ms. DeWitt said

25 that he is; he's a completely evil, despicable person.  And to

1  use some out-of-court conversation that supposedly transpired

2  between Mr. Kadamovas and Mr. Markovskis, where the source of

3  information about Ms. Solovyeva's apparent role is coming from,

4  that I don't think is appropriate and fair.

5          And as a matter of fact, your Honor --

6          THE COURT:  It was in the Government's brief.

7          MR. CRAIN:  I'm saying that Mr. Kadamovas could say

8  that Ms. Solovyeva was Charles Manson's right-hand person, and

9  they would have about as much credibility as any statement that

10 he might have made about her role in the case.

11         This Court heard one trial, and she testified at two

12 trials, and the facts are as Ms. DeWitt says.

13         With regard to her involvement in the abduction of

14 Mr. Kharabadze, I have talked to the lady who was not called as

15 a witness in the case, but Larissa, who was the woman who Ms.

16 Solovyeva went to Mr. Safiev's house so that their children

17 could play together; they were friends.  I don't believe there

18 was ever any evidence that Mr. Kadamovas ever saw this video,

19 your Honor, that the Court has placed emphasis on.

20         But in any event, her reasons for going there during

21 the summer were exactly as has been represented by the

22 Government.  They were wholly innocent and they had nothing to

23 do with her masterminding some plot or having any part in some

24 plot to target Mr. Safiev on behalf of Mikhel and Kadamovas.

25         And in addition, the Court made a comment, and with

1    all respect to the Court please, but that without Ms.

2    Solovyeva, that the defendant, the lead defendants Mikhel and

3    Kadamovas, would not have succeeded with Kharabadze and Safiev.

4    And I respectfully disagree with that.  There's no reason to

5    believe that.  Mikhel was a highly skilled, one of the most

6    amazingly astute -- even though he got caught, as criminals

7    generally do -- but one of the most skilled and sophisticated

8    defendants I've ever seen.  There's no reason to believe that

9    had Ms. Solovyeva not made that phone call that, as the Court

10   said, Mr. Kharabadze and Mr. Safiev would be alive today.  I

11   just disagree with that.

12            THE COURT:  Well, they had made several attempts to

13   try to capture Mr. Safiev, including kidnapping Ms. Pekler and

14   murdering her, and that didn't work.

15            MR. CRAIN:  That's true, your Honor, they did.

16            THE COURT:  And they had talked about staging a

17   traffic accident to secure him.  They had talked about using

18   Mr. Krylov to sell various equipment to him.  They considered a

19   home invasion.  The FBI was on the case at this time because of

20   the Umansky murder.

21            MR. CRAIN:  I agree.

22            THE COURT:  And but for the fact that she lured these

23   two individuals to that location, they would probably be alive

24   today.

25            MR. CRAIN:  Well, I respectfully disagree because

1   although it's true, your Honor, I --

2           THE COURT:  Well, Counsel, I expect you to disagree.

3   You're Counsel for your client.  I expect it.

4           MR. CRAIN:  Well, I'm not only -- I'm her Counsel but

5   I'm stating what I believe from the heart, too, your Honor,

6   which I generally try to avoid doing in my representation of

7   someone but nevertheless, these two men, Mikhel and Kadamovas,

8   although, yes, they had other ideas and other schemes that they

9   had concocted to try to get a hold of Kharabadze and Safiev.

10  Safiev had an office in Santa Monica.  Kharabadze was a man

11  about town frequently seen in restaurants all over the place.

12  It does not strain the imagination at all to think that had

13  this phone call not been made that they would have found some

14  other means of hooking up with these guys even though their

15  previous few plans had not come to fruition.

16          THE COURT:  They didn't want Kharabadze.  They wanted

17  him only to secure Mr. Safiev.  Kharabadze, yes, could easily

18  have been abducted.  Mr. Safiev was far more difficult and --

19          MR. CRAIN:  Well, he did have an office in Santa

20  Monica where he frequently was at work and so he was not all --

21  he was not hiding in a cave somewhere where he couldn't be

22  reached.  He was a public man.

23          THE COURT:  Any other comments or any other matters

24  regarding the PSR that you would like to address?

25          MR. CRAIN:  The Government's 5K1 Motion, your Honor,

EXCEPTIONAL REPORTING SERVICES, INC

1    I think accurately sets forth Ms. Solovyeva's role in this

2    case.  The Court mentioned the Pekler incident and as the

3    Government has stated in the 5K1 Pleading, she was not aware

4    prior to the abduction of Ms. Pekler that this had taken place.

5    So I did want to say some things about --

6           THE COURT:  She was not aware of the abduction of

7    Ms. Pekler?  Was that your point?

8           MR. CRAIN:  Can I step over here for just a moment?

9           THE COURT:  Yeah, please.

10          MR. CRAIN:  It says on Page 17 of the 5K1 Motion that

11   she was not aware that Ms. Pekler had been abducted and

12   murdered until after the fact.

13          THE COURT:  Well, until after the fact.  Yeah, but

14   she was aware that --

15          MR. CRAIN:  Yes.  That's what I meant.  I thought

16   that's what I said.  I'm sorry.

17          THE COURT:  She -- and when -- from Mr. Muscatel and

18   the other occurrences, she was aware that if somebody was

19   kidnapped, they were likely to be murdered is the point.  And

20   after Ms. Pekler was murdered, she assisted in washing the

21   blood off of the jeans of Mr. Krylov, as I recall.

22          MR. CRAIN:  As I stated, we agree with the

23   Government's factual assertions with regard to Ms. Solovyeva's

24   role as they're set forth in the 5K1 Motion that the Government

25   filed in relation to her.

1    THE COURT:  Thank you.

2         MR. CRAIN:  I did want to -- your Honor, if the Court

3    will bear with me for a few moments, I wanted to make a few

4    comments about Ms. Solovyeva, about her person, about her as an

5    individual and the Court has heard this, you know.  As I said,

6    you know, I've seen a lot of Defendants, your Honor.  I've seen

7    a lot of sophisticated people.  I've seen a lot of bad crooks.

8    I've seen all kinds of people.  Ms. Solovyeva is not that kind

9    of person.  She came to this country.  She didn't speak a word

10   of English.  She came here in the hopes of working.  She comes

11   from a place out in eastern Siberia about eight hours from

12   Vladivostok where people have very little opportunity and she

13   came to the United States as many other immigrants do and,

14   unfortunately -- and she's sitting here today paying the price

15   for the most unfortunate events that have ever happened to her

16   in that she came in contact with Jurijus Kadamovas.  And before

17   long, he had impregnated her.  She had a small child.  That

18   child now resides in --

19        THE COURT:  Counsel, look --

20        MR. CRAIN:  Yes, your Honor.

21        THE COURT:  -- it's -- you want to portray her as a

22   victim in terms of being impregnated?  She had a choice in the

23   matter.  She got pregnant.

24        MR. CRAIN:  Your Honor, I'm not a believer in what's

25   commonly called victimology and I'm not trying to portray her

1    as a victim but I'm saying she did become pregnant.

2            THE COURT:  Yes.

3            MR. CRAIN:  And was --

4            THE COURT:  She chose to become pregnant.

5            MR. CRAIN:  Well, I'm not certain but she became --

6            THE COURT:  There's eleven forms of contraception.

7            MR. CRAIN:  Well, she became pregnant.

8            THE COURT:  Okay.

9            MR. CRAIN:  All right.

10           THE COURT:  And she had a small child and she lived

11   with a person that the Government has very aptly described as a

12   cruel, controlling and manipulative person.  Ms. DeWitt

13   mentioned a wire tap.  There's also a statement from

14   Mr. Altmanis in his debriefing where he described an incident

15   at a party where Mr. Kadamovas nearly broke her hand in a fit

16   of anger in front of all the other people at the party and bent

17   her fingers back in a very severe manner where it looked to

18   Mr. Altmanis like they were going to break.  So she did not --

19   her life with Mr. Kadamovas was not some bed of roses and, in

20   fact, it was -- she was in a -- in one of those situations that

21   some young women get into, unfortunately, where they're in the

22   company of and under the control of a controlling and

23   manipulative person.

24           And I agree with Ms. DeWitt in her comments or

25   response to the Court's take on the greed issue.  I agree with

1   the Government wholeheartedly on that, your Honor. And also

2   not only was Mr. Kadamovas on the scene but he was bringing

3   Mr. Mikhel around. So she was -- and Altmanis. So here was a

4   young woman, a naïve young woman and basically a sweet young

5   woman who -- well, your Honor, you've never met Ms. Solovyeva.

6   I've spent six years. So I'm telling the Court candidly. I'm

7   not here to dress up the facts. I'm here to tell the Court

8   exactly what the facts are. The Court may have its own view of

9   Ms. Solovyeva and see her as some sort of a different kind of

10  person. Yeah, she's involved in this case and, yes, she's

11  accepted responsibility for it.

12          THE COURT: Okay. Do you have any concluding

13  remarks, please?

14          MR. CRAIN: Yes, I do, your Honor. You know, early

15  in the case when she was represented by other Counsel and not

16  charged with anything, the Court talks -- had talked about

17  attorneys advising the Defendant that it's in their self-

18  interest and so forth. Well, for whatever reason, without

19  having criminal charges pending against her, Ms. Solovyeva met

20  with the Government, with the Agents and the U.S. Attorneys and

21  gave very detailed statements.

22          THE COURT: She was already detained at that time; is

23  that correct?

24          MR. CRAIN: She was detained on immigration

25  charges --

1    THE COURT:  Yes, I understand.

2    MR. CRAIN:  -- ready to be deported with her

3    daughter, her young daughter who she hasn't seen for years

4    who's growing up without her mother.  She was ready to be

5    deported to Russia.  Instead of being deported, she went of her

6    own accord with her attorney to the courthouse to meet with the

7    U.S. Attorneys and gave them very detailed statements and

8    subsequently gave them more and more sessions and testified at

9    two trials.

10   THE COURT:  I agree she should be rewarded for her

11   substantial cooperation.  The question is what should the end

12   result be and we just see it a little bit differently.

13   MR. CRAIN:  And let me just -- I know the Court wants

14   me to conclude and I don't want to go on and on and on but I do

15   want to say, your Honor, also -- and I think another factor the

16   Court has to consider is not -- are not only the factors that

17   the Court has described but also do we have a potential

18   recidivist sitting in front of us?  Absolutely not.  This is

19   not a professional criminal.  This is somebody who made

20   mistakes and if the Government's position is accepted by the

21   Court will serve -- and I would agree, she probably will get

22   the credits because she's had an excellent record while in

23   custody -- but would receive a sentence of 132 months.  And as

24   Ms. DeWitt says, it's not that she's walking into court through

25   the front door and we're talking about getting out in 3.3 years

1   or something like that.  She's been in custody since the --

2   early in 2002.

3           So this is not someone who's going to re-offend, your

4   Honor.  This is not somebody who poses a danger to society.

5   This is somebody who wanted to help the Government, did help

6   the Government, did great things for the Government, as

7   Ms. DeWitt just pointed out, in ensuring that Ms. Kadamovas

8   would receive a death sentence, the first one in this District

9   since 1946, and is to pay a price.  The price should be no

10  more, your Honor, than the Government has recommended, 132

11  months.  Thank you for the time, your Honor.  I'll be glad to

12  answer any questions if you have them.  I don't know if I did

13  mention -- I think I did -- about that video.  I think --

14  there's no evidence that Mr. Kadamovas ever saw that.  I think

15  I did say that.  So if the Court has any questions, I'll be

16  happy to answer.

17          THE COURT:  I have no questions.  Thank you.

18          MR. CRAIN:  Thank you, your Honor.

19          THE COURT:  Does your client wish to make a

20  statement?

21          MR. CRAIN:  I believe so.

22          THE COURT:  Yeah, from the -- she would approach the

23  lectern, please.

24          MR. CRAIN:  Your Honor, I think she wishes to address

25  the Court in English.

48

1          THE COURT:  Please.

2          THE DEFENDANT:  Thank you, your Honor.  I would like

3   to say a few words --

4          THE COURT:  Would you speak into --

5          THE DEFENDANT:  Closer?

6          THE COURT:  -- louder and into the microphone?

7          THE DEFENDANT:  Your Honor, I would like to say a few

8   words and say that over and over again how sorry I am for what

9   I did.  I'm sorry for all the victims.  I know I have made a

10  terrible choice that I will be regretful of all my life.  I am

11  truly sorry for the part of being -- of -- for being -- I'm

12  sorry -- for being a part of causing such a pain and sorrow to

13  others.  I told so many times myself if I would have a chance,

14  I would do differently if I only could change, undo these

15  terrible things.  Unfortunately, I cannot.  And I'm terribly

16  sorry for that.  I'm sorry for all family victims.  I really --

17  I just want to ask for your forgiveness and, your Honor, for

18  your mercy.  I'm sorry.  Thank you for your time and if it

19  would be safe to say regarding video tape, Kadamovas never seen

20  video tapes and I honestly, sincerely telling you I videotape

21  my child with friends regardless show that -- I mean, Kadamovas

22  never saw that.

23         THE COURT:  Yeah, I accept that as a true statement.

24         THE DEFENDANT:  Thank you, your Honor.

25         THE COURT:  Under the Federal Rules of Procedure, if

1   there's any families of the victims, they could address the --

2   make a statement.

3          MR. UMANSKY:  I want to.

4          THE COURT:  Mr. Umansky.

5      (Interpreter whispered to Mr. Umansky)

6          MR. UMANSKY:  English.  Your Honor, I will talk on

7   behalf of my family and me and I believe that as to the victims

8   will agree with me.  I disagree with Ms. DeWitt, the Government

9   in the assessment of her.  Honesty and truthful, she knew from

10  the beginning about everything was done by that herd of

11  animals.  She would save lives.  Instead, she didn't.  She, to

12  the end, held them, abduct and kill people.  Thank you.

13         THE COURT:  Thank you.  Are there any other matters

14  to address before the Court sentences the Defendant?

15         MR. CRAIN:  I'm not aware of any, your Honor.

16         THE COURT:  Government?

17         MR. CRAIN:  No, your Honor.  Thank you very much.

18         THE COURT:  Okay.  A very difficult sentencing

19  decision only because of the Government's position and the

20  Government's need to be able to -- in these types of very

21  serious criminal acts, be able to secure valuable information

22  by having coconspirators cooperate against the main

23  perpetrators.  And in this case it was obviously a significant

24  accomplishment to -- and I recognize that because I've presided

25  in other death penalty cases where the Government was able to

1   secure the testimony of a spouse.  Very powerful testimony if

2   you can secure that and I recognize that Ms. Solovyeva was a

3   significant witness here and added to the Government's

4   prosecution and the merits of its claims before juries because

5   of that testimony.

6          And the Government's position has made it very

7   difficult on the Court because I want to make sure that I do

8   everything I can in the future to assist law enforcement in

9   terms of allowing them to secure these types of witnesses and

10  pursue these types of prosecution.  So that's a significant

11  factor but let me just make a couple of comments.

12         Again, this Defendant is looking at life without the

13  possibility of release.  She's 32 years old.  According to the

14  Government's calculation, if I sentenced her to 132 months with

15  time off for good behavior, she would serve actually 9.35 years

16  and she has served approximately six years.  She will be out at

17  approximately 39 years old.  If you look at the actuarial

18  tables, she probably has another 42 years after that remaining

19  in her life.  So that is a long period of time.

20         The Court is not going to follow the Government's

21  recommendation.  However, the Court is going to -- and based on

22  the Supplemental Pleading and the Declaration offered by the

23  Declarant, is going to come off the sentence that I intended to

24  impose in this case at the urging of the Government.  And I

25  guess the Court has to balance the 5K considerations with 3553

1   considerations and, again, it's not simply the ability of the

2   Government to go forward with prosecutions in the future but

3   also making sure that serious offenders are treated justly,

4   that the public maintains its respect for the judicial process

5   system, that the victims who cannot be here are represented by

6   a sentence that reflects the seriousness of the offenses done

7   to them and the Court has to balance that process.

8           Before I sentence the Defendant, though, I need to --

9   I'm in agreement with the Government that Mr. Markovskis is

10  less culpable than this Defendant here and that was reflected

11  in their sentencing position.  Is there any legal impediment to

12  modifying the sentence of Mr. Markovskis?

13          **MS. DEWITT:**  I don't believe so, your Honor.

14          **THE COURT:**  If I sentence -- the Court is -- will

15  grant the 5K Motion.  The Government has the -- the Adjusted

16  Offense Level is 42.  The Government has urged a ten-level

17  reduction and that would place the Defendant at a Level 32,

18  which would be 121 to 151 months.  The Court will grant the 5K

19  Motion and I find this very difficult to do because I see this

20  case very differently than Counsel.  But the Court will grant

21  the 5K Motion and grant an eight-level reduction, placing the

22  Defendant in Criminal History Category I with an Offense Level

23  of 34.  That will place her in the Guideline range of 151 to

24  188 months.  The Court would intend to sentence the Defendant

25  to 180 months.

1      Now, that means that this Defendant will have

2  approximately 40 years of life left after she is released from

3  prison, time to spend with her family, her daughter, time to

4  enjoy her life and the other two victims that she's responsible

5  for helping to abduct and murder will not have that enjoyment.

6  And I want to make it very clear, Ms. Solovyeva, that but for

7  the vigorous urging of Counsel for the Government, this would

8  never occur.  This would absolutely never occur.

9      And so I guess the sentence that should be imposed

10  here is the sentence that accomplishes the Government's goal of

11  cooperation in the future, the Court's goal of making sure that

12  the 3553 factors are considered.  And so the end result should

13  be that whatever sentence the Court imposes, it would -- if

14  Counsel for the Defendant knew that that would be the ultimate

15  sentence, you would nevertheless encourage your client to move

16  forward and cooperate with the Government and I believe a

17  sentence of 180 months is extremely generous and is a sentence

18  that clearly accomplishes what the Government is trying to

19  achieve, at the same time is a sentence that's more reflective

20  of her involvement.

21      The Court will sentence the Defendant as follows.  I

22  believe I've ruled on all of the objections.  That being the

23  case, since I'm sentencing this Defendant to 180 months, the

24  3553 factors and Mr. Markovskis' involvement will require the

25  Court to make an adjustment to his sentence and I agree that

1   there should be at least a 30-month reduction and his sentence

2   should be 150 and not 180.

3            The Court, having considered the sentencing factors

4   enumerated in Title 18, 3553, the Court, considering that the

5   statutory mandatory minimum penalty in this case is life

6   imprisonment without the possibility of release, the following

7   sentence is imposed.  The Court has determined that the

8   Adjusted Offense Level is 42, Criminal History Category I.   The

9   Government has moved pursuant to 5K for a reduction below the

10  statutory minimum.  The Court grants that motion.  It is

11  ordered that the Defendant shall pay the United States a

12  Special Assessment of $300 which is due immediately.

13           It is ordered that the Defendant shall pay

14  restitution in the amount of $725,245 pursuant to Title 18,

15  U.S.C.3663(a).  The restitution and order shall be paid to

16  George Safiev in care of Mr. Teshec (phonetic).  Restitution

17  shall be due during the period of imprisonment at the rate of

18  not less than 25 per quarter and pursuant to the Bureau of

19  Prisons Inmate Financial Responsibility Program.  If any amount

20  of restitution remains unpaid after release from custody,

21  nominal monthly payments of at least $50 shall be made during

22  the period of Supervised Release.  These payments shall begin

23  30 days after the commencement of supervision.  Nominal

24  restitution payments are ordered as the Court finds that the

25  Defendant's economic circumstances will not allow her to make

1  either immediate payment or future or other amounts that would

2  be ordered.

3          The Defendant shall be held jointly and severally

4  liable with co-participants Mr. Mikhel, Mr. Kadamovas,

5  Mr. Krylov, Mr. Altmanis and Mr. Markovskis for the amount of

6  restitution ordered in this judgment.  Pursuant to Title 18,

7  U.S.C. 3612(f)(3)(a), interest on the restitution is waived.

8  The Defendant does not have the ability to pay interest.

9  Payments are subject to penalties and default and delinquency

10  pursuant to Title 18, U.S.C. 3612(g).  The Defendant shall

11  comply with the following General Order 01-05.  All fines are

12  waived.  The Defendant does not have the ability to pay a fine.

13          Pursuant to The Sentencing Reform Act of 1984, it is

14  the judgment of the Court the Defendant Ms. Natalya Solovyeva

15  is hereby committed on Counts One, Three and Four of the Second

16  Superseding Indictment to the custody of the Bureau of Prisons

17  to be imprisoned for a term of 180 months.  And I find it very

18  difficult to make that pronouncement.  This term consists of

19  180 months imprisonment on each of the Counts One, Three and

20  Four of the Second Superseding Indictment to be served

21  concurrently.

22          When released from imprisonment, the Defendant shall

23  be placed on Supervised Release for a term of five years.  I

24  need the phone.  The term consists of five years on each of

25  Counts One, Three and Four of the Second Superseding Indictment

55

1   to be served concurrently under the following terms and

2   conditions.   The Defendant shall not commit any violation of

3   local, State or Federal law.   The Defendant shall comply with

4   the rules and regulations of the U.S. Probation Office.   During

5   the period of supervision, the Defendant shall pay the Special

6   Assessment and restitution in accordance with the Judgment

7   Orders of the Court.

8           The Defendant shall comply with the Immigration rules

9   and regulations of the United States.   If deported from this

10  country, either voluntarily or involuntarily, you may not

11  reenter the United States illegally.   The Defendant is not

12  required to report to the Probation Office while residing

13  outside the United States.   However, within 72 hours of release

14  from any custody or any reentry to the United States during the

15  period of Court ordered supervision, the Defendant shall report

16  for instructions to the U.S. Probation Office located at 312

17  North Spring Street, Room 600.

18          The Defendant shall not obtain or possess any

19  driver's license, social security number, birth certificate,

20  passport or any other form of identification in any name other

21  than her true legal name without prior written approval of the

22  Probation Officer nor shall the Defendant use for any purpose

23  or in any manner any name other than her true legal name.   The

24  Defendant shall cooperate in the collection of a DNA sample.

25  As directed by the Probation Officer, the Defendant shall apply

56

1    all monies received from tax refunds, lottery winnings,

2    inheritances, judgments and any anticipated or unexpected

3    financial gains to the outstanding quarter's financial

4    obligation.  The drug testing condition will be imposed because

5    there is evidence in this case that the Defendant supplied

6    controlled substances and, therefore, those conditions will be

7    imposed.

8              In sentencing the Defendant, the Court has considered

9    the goals that the Government is trying to achieve under 5K and

10   attempted to balance those interests and goals with the factors

11   enumerated in 3553.  The Court agrees that the Defendant

12   provided significant cooperation to the Government and assisted

13   the Government in the prosecution of Mr. Mikhel, Mr. Kadamovas

14   and Mr. Krylov who are serious -- very serious, horrific

15   offenders.  In mitigation, the Court has also considered the

16   Defendant's age and her dysfunctional relationship with

17   Mr. Kadamovas.  In aggravation, the Court believes that this

18   Defendant is not the victim that she has portrayed herself to

19   be and has participated in the offenses because of financial

20   consideration and the Court, also in aggravation, understands

21   that but for the acts of the Defendant, there are two

22   individuals who probably would be alive today.

23             I must advise you of your right to appeal.  You have

24   a right to appeal your sentence if you believe, Ms. Solovyeva,

25   that your sentence is contrary to law, contrary to a Plea

1   Agreement.  I would have the Government, if the Government

2   requests, to read that portion of the Plea if you so choose to

3   into the record.  It is in the Court's opinion the sentence

4   today is consistent with the goals in the Plea Agreement and

5   the Defendant has waived her rights but she has to decide that

6   between and amongst her lawyers.

7          MS. DEWITT:  I think you've accurately set forth what

8   the Plea Agreement says, your Honor.

9          THE COURT:  If you intend to appeal your sentence,

10  with few exceptions, any Notice of Appeal must be filed within

11  ten days from today's date.  That being said, I want to take

12  just a moment to compliment Counsel for the Defendant and

13  Counsel for the Government again.  We just see it differently.

14  I respect your views and the advocacy that you have brought to

15  court today on behalf of your client.  I think you represented

16  your client and the Bar as expected of lawyers of high standing

17  in the legal community and the Government has done likewise and

18  has convinced the Court to make some adjustment here for the

19  reasons articulated in the brief.  So thank you very much.

20         MR. SPEAKER:  Your Honor, are there remaining counts?

21         THE COURT:  Remaining counts?

22         MS. DEWITT:  No.  There are no remaining counts that

23  need to be dismissed as to this particular Defendant, your

24  Honor, but the underlying Indictments do need to be.

25         THE COURT:  Okay.  Motion will be granted.  Thank

1    you.

2              THE CLERK:   Court's in recess.

3         (This proceeding ended at 10:46 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXCEPTIONAL REPORTING SERVICES, INC

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    _February 21, 2008_


*TONI HUDSON, TRANSCRIBER*